UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERMAINE BOMAR, *et al.*,       Case No. 08-12629

     Plaintiffs,       John Feikens
vs.       United States District Judge

CITY OF PONTIAC, *et al.*,       Michael Hluchaniuk
     United States Magistrate Judge

     Defendants.
_____/

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkt. 20, 39)**

## I. PROCEDURAL HISTORY

Plaintiffs filed their amended complaint on June 20, 2008, asserting

violations of their constitutional rights under 42 U.S.C. § 1983 and state law claims

of false imprisonment, assault and battery, and intentional infliction of emotional

distress. (Dkt. 2). Plaintiffs filed a second amended complaint, pursuant to

stipulation, to pursue claims against additional defendants. (Dkt. 11). Again, by

stipulation, plaintiffs were allowed to file a third amended complaint on February

9, 2009. (Dkt. 14, 16). On May 29, 2009, defendants filed a motion for summary

judgment based on the defense of qualified immunity. (Dkt. 20). Plaintiffs filed a

response on July 6, 2009 and defendants filed a reply on July 10, 2009. (Dkt. 29,

30). On June 16, 2009, this motion was referred to the undersigned by District

Judge John Feikens. (Dkt. 22). The Court held a hearing on August 11, 2009.

On August 6, 2009, defendants filed a motion for leave to file a partial dispositive motion regarding the claim asserted by plaintiff Kartier Bomar. (Dkt. 33). On August 12, 2009, Judge Feikens referred this case to the undersigned for all pretrial purposes. (Dkt. 36). Plaintiffs filed a response to defendants' motion for leave on September 1, 2009 and the Court granted defendants' motion on October 22, 2009. (Dkt. 38). Defendants filed their second motion for summary judgment on October 28, 2009. (Dkt. 39). Plaintiffs filed a response on November 30, 2009. (Dkt. 41). On December 4, 2009, defendants filed a reply. (Dkt. 43). The Court held a hearing on the second motion for summary judgment on December 21, 2009. These matters are now ready for report and recommendation

For the reasons set forth below, the undersigned **RECOMMENDS** that the Court **GRANT** defendants' motion for summary judgment in part and **DISMISS** all defendants from this case except defendant Main.

## II. STATEMENT OF FACTS

The facts of this case are largely undisputed. Pursuant to a warrant, there was a drug raid at a house on Neome Street in the City of Pontiac. (Dkt. 20, Ex. A, Police Report). Defendant officer Main was one of the officers in charge of the entire operation. His partner in that capacity was non-defendant officer Janczarek. (Dkt. 20, Ex. B, Main dep., p. 6). Members of the SRT (Special Response Team)

made their initial entry and secured the house. The NES (Narcotics Enforcement Section) team then entered the structure to conduct their investigation, securing evidence, etc. SRT members shifted their responsibilities to maintaining outside security. (Dkt. 20, Ex. A; Ex. B, p. 7; Ex. E, Wheatcroft dep., p. 6; Ex. F, Wood dep., pp. 6-7). While this was happening, cell phones secured from the subjects arrested in the course of the raid rang, revealing that other drug traffickers would be approaching the structure. Defendants were advised that at least one vehicle would be approaching containing drugs, handguns and AK-47's. (Dkt. 20, Ex. A; Ex. B, pp. 8-9; Ex. E, pp. 6-7; Ex. F, p. 7). Separated by a few minutes in time, two vehicles approached. The first was secured without incident, but did not have the weapons, suggesting that the officers should remain vigilant for the approach of another vehicle. Soon, the second anticipated vehicle approached. As the officers approached to secure the vehicle, it went into full reverse, backing up to the intersection with Elizabeth Lake Road and heading in the direction of an almost dead end. The only way out was down Genesee. The officers were able to see that the driver was a young black male. (Dkt. 20, Ex. B, pp. 9-10, 12; Ex. F, p. 8). Wheatcroft observed that it was a four door sedan. (Dkt. 20, Ex. E, p. 9). Wood recalled a four door Taurus. (Dkt. 20, Ex. F, p. 8). Seeing the direction the car went, Main grabbed Wheatcroft and Wood, got into an unmarked police vehicle and went south on Neome to try to cut off the subject vehicle presumably heading

south on Genesee, which ran into Neome. (Dkt. 20, Ex. B, pp. 10-11, 13-16; Ex. C, Ex. F, p. 8). It was hoped that they could get to Genesee before the fleeing vehicle could escape. *Id*

Seeing no activity, they became concerned that the vehicle pulled into a driveway to hide. Accordingly, they began to slowly go north on Genesee. They were looking for a similar vehicle. One such similar vehicle was observed in the driveway of what was later determined to be the Bomar home. The officers stopped to look at it more closely. (Dkt. 20, Ex. B, pp. 20-21). On the far side of the vehicle, they observed the head of a black male "pop up" as though it had been crouched behind the vehicle hiding. (Dkt. 20, Ex. B, p. 23; Ex. F, p. 9). This turns out to have been Kourdon Maxwell, who had taken his dog out so it could relieve itself. Kourdon later explained that the dog was without a leash and that he was waiting to pick him up once the dog had finished relieving himself. (Dkt. 20, Ex. D, Maxwell dep., pp. 7-8). Main testified that he commanded the individual to stop and come to them, observed the individual look around as though he was getting ready to run, commanded the individual not to run and then observed the individual run to the backyard, when they gave pursuit. (Dkt. 20, Ex. B, p. 24). Kourdon Maxwell testified that after the car stopped, the officers jumped out and ran toward him with guns out and commanding him to not move. He ran. They did not shoot. (Dkt. 20, Ex. D, pp. 7-9). Main made direct pursuit. The other officers

engaged in supportive back-up by going around the house in other ways to cut off further flight. Main, with the other officers closely behind him, caught up with Kourdon as he was attempting to enter the back door of the house. (Dkt. 20, Ex. B, pp. 24-25; Ex. E, pp. 10-11).

Kourdon indicated that he managed to get into the back door for a few seconds before the officers entered, with sufficient time for him only to announce to his mother that he was being chased. (Dkt. 20, Ex. D, pp. 10-11). Main tried to grab Kourdon. He ultimately went a few steps into the house. There is no controversy that Main went past the threshold of the door and entered the house. Germaine Bomar, in what defendants acknowledge was a perfectly reasonable effort to protect her son from strangers, intervened. Main explained that he initially thought that she was trying to strike Kourdon as a stranger who invaded her home. After a few moments, he realized that she was actually attacking him (Main). (Dkt. 20, Ex. B, p. 28). Main handed the young man off to another officer and focused his attention on dealing with Ms. Bomar. Both Ms. Bomar and Kourdon were pulled out of the house and taken to the ground in the back yard. They were placed on their stomachs and handcuffed.

Once the situation was secured, the officers individually appreciated that these were not the subjects of interest, removed the handcuffs and contacted their supervisor, Sergeant Darryl Cosby. (Dkt. 20, Ex. B, pp. 28-33; Ex. E, pp. 16-17;

Ex. F, pp. 16-17). Kourdon testified that one of the officers was wrestling with his mother when another one of the officers also entered the home then grabbed him and pulled him down the steps in the house, hitting him with a flashlight in the eye. (Dkt. 29, Ex. A, Maxwell dep., pp. 11-13). The blow from the flashlight knocked Kourdon down and he was lifted back up by the officer who pulled him back outside of the house, telling him to lie down on the ground on his stomach and who then handcuffed him. (Dkt. 29, Ex. A, pp. 13-14). Kourdon testified he also remembers his mother being pepper sprayed by the same officer. (Dkt. 29, Ex. A, pp. 15-16). He remembers that his mother was also hit once "in the eye and the jaw and stuff" after she had been handcuffed. (Dkt. 29, Ex. A, p. 20). Ms. Bomar does not deny grabbing the officer attempting to restrain her (defendant Main) and contends that Main repeatedly struck her. (Dkt. 20, Ex. G, G. Bomar dep., pp. 49-50). Ms. Bomar testified that Main pepper sprayed her and struck her one time on the jaw after she was handcuffed. (Dkt. Ex. G, pp. 52-53). Officer Main testified that it was not difficult to get the handcuffs on plaintiff, that she "fought a little bit but it wasn't hard to get them on her." (Dkt. 20, Ex. B, p. 30). Officer Main recalls getting Ms. Bomar outside and on the ground and that she was "vocalizing" a "probably a little bit higher" than conversational tone. (Dkt. 20, Ex. B., p. 32).

　　　　According to defendants, the medical records contradict plaintiff's testimony

as to exactly what, how and when Ms. Bomar experienced force. After the officers left the scene, the Bomars went to Pontiac Osteopathic Hospital.

("POH"). They arrived a little before 11:00 p.m. (Dkt. 20, Ex. H, Germaine Bomar POH records, p. 50). The initial nursing record triage note reports that she was assaulted in the back yard by a man in camouflage in an effort to protect her son. She complained of pain to her forehead and left leg pain, indicating direct blows of fists. (Dkt. 20, Ex. H, p. 51). She was subsequently examined by a physician. She complained that she was pushed down on the ground, that an officer put his body weight on her left knee and punched her in the face as she went up to try to cut off others assaulting her son. She complained of pain to her forehead and the back of her neck. The document reflects the absence of any dental injury. (Dkt. 20, Ex. H, p. 53). Ms. Bomar initially declined any head or c-spine examination, indicating that she just wished to go home. However, she apparently agreed to have the examinations before being discharged. Cervical spine x-rays were entirely negative. (Dkt. 20, Ex. H, pp. 60-61). Additionally, x-rays of the temporal mandibular joint were also negative. (Dkt. 20, Ex. H, pp. 62-63). Plaintiff was discharged with an instruction to follow up with her own doctor should she have any additional problems.

A few days later, she went to North Oakland Medical Center (NOMC) on September 14, 2007 just before 6:00 p.m. The intake sheet indicates in the final

diagnosis section that she left "AMA," against medical advice. (Dkt. 20, Ex. I, NOMC records, p. 42). She was complaining of nausea, coldness, fatigue and faintness, along with neck pain on the left side of her neck that she described as a "pinch." (Dkt. 20, Ex. I, p. 46). At approximately 6:15, the nursing note reflects the following observations:

> 18:13: Patient began screaming at me when I asked her to move the blanket from her mouth so that I could hear her tell me what brought her to the ER. She was verbally insulting and threatened me. Security was asked to escort her from the ER. She continued to holler at security.

> 18:18: Patient lying on cart and arguing with P.A. (physician assistant). Patient being loud and verbally abusive to PA Security called to bedside.

> 18:20: Patient continues to be loud and using foul language calling PA "fucking bitch." Patient screaming at staff and security. Security here to escort patient out of ER.

> 18:26: Patient moving neck freely and yelling and cursing at staff and security.

(Dkt. 20, Ex. I, p. 48). She returned to POH with complaints of neck pain and flu-type symptoms. (Dkt. 20, Ex. H, p. 37). No clinical evidence of trauma was found. She was discharged with instructions to take her medications as directed and to follow up with her own doctor in a few days. (Dkt. 20, Ex. H, p. 39).

According to defendants, the first time the record evidence reflects any type of dental or TMJ problem within the POH records is nearly eight months later on

May 5, 2008, when plaintiff presented with generalized complaints of jaw and head pain. (Dkt. 20, Ex. H, pp. 23-24). Indeed, Ms. Bomar did not present to any facility complaining of TMJ-styled symptomology until five months later. She presented to Dr. Daniel Schwarb in Waterford on February 21, 2008 with primary allegations of ongoing face pain. The records indicate that Ms. Bomar candidly reported that she had a number of injuries over the years contributing to headaches and neck pain, including a motor vehicle accident within the last 10 years, a serious fall, and a facial blow from what the doctor refers to as a "tree holder" in the last year. Defendants point out that there is no mention in these records of plaintiff being struck in the jaw by police as she attempted to defend her son. (Dkt. 20, Ex. J, Dr. Schwarb report, pp. 17-18). According to defendants, the serious fall reflected in Dr. Schwarb's records appears to be corroborated in records obtained from TheraMatrix, a facility from which she intermittently attended for physical therapy. (Dkt. 20, Ex. K, TheraMatrix records). Specifically, those records reflect that Ms. Bomar took a serious fall while rollerblading or roller-skating. (Dkt. 20, Ex. K, p. 16). Defendants point out that, notwithstanding a doctor's prescription for regular and ongoing physical therapy treatment for her neck, Ms. Bomar's attendance was scant and intermittent at best, there being numerous no shows. (Dkt. 20, Ex. K, p. 3). While Ms. Bomar has represented that Dr. Schwarb explained to her that her jaw is out of line by "two fingertips" to the

right, according to defendants, that is not contained within his records. (Dkt. 20, Ex. G, p. 82).

At her deposition, plaintiff testified that she immediately intervened and was striking the officer. (Dkt. 20, Ex. G, pp. 49-50). She admitted to striking the officer multiple times and acknowledges she was struck multiple times during the course of the struggle. She contends that she was ultimately taken outside and taken to the ground. *Id.* Plaintiff also contends that after she was taken to the ground and handcuffed, she was pepper sprayed and hit one more time in the jaw. *Id.* After awhile, a uniformed police officer arrived, who Ms. Bomar recognized from their church and his presence immediately began to give her comfort. (Dkt. 20, Ex. G, pp. 60-61). She thinks, but was not sure, that he ordered that the cuffs be removed. This officer was non-defendant officer Dorkins. Dorkins was deposed and had no recollection of ever giving such an order. He testified that Ms. Bomar and Kourdon were both out of handcuffs by the time he arrived. (Dkt. 20, Ex. M, Dorkins' dep., p. 10). According to defendants, this is not a material factual controversy, given that the officers themselves testified that after they had secured the situation, they became quickly satisfied that Kourdon was not the subject they were interested in and undid the handcuffs. (Dkt. 20, Ex. B, pp. 33-34; Ex. E, pp. 16-17; Ex. F, pp. 16-17). Eventually all of the officers left the scene. Ms. Bomar then attempted to have dinner with her family. Thereafter, they went to

the hospital.  (Dkt. 20, Ex. G, p. 70).

Kourdon, now 15 years old (and 12 years old on the date of the event),
testified that his mother had sent him out with the dog as she was cooking dinner.
(Dkt. 20, Ex. D, pp. 7, 10).  The dog was without a leash.  (Dkt. 20, Ex. D, p. 8).
At some point, he stooped down on the driveway to pick up the dog and when he
stood up, he observed the gentlemen get out of their vehicle and run at him.  He
testified that the men had pulled weapons. Although they were yelling at him to not
move, he ran for the backyard and the back door, which would get him into the
house.  (Dkt. 20, Ex. D, p. 10).  He described his mother's effort to shield him from
being secured by the men.  (Dkt. 20, Ex. D, p. 11).  She was taken outside and so
was he.  Kourdon testified that just before he was taken outside, he was struck in
the head by a flashlight.  (Dkt. 20, Ex. D, pp. 12-13).  Unlike his mother, he
testified that no force was used on him after he was taken to the ground and
handcuffed.  (Dkt. 20, Ex. D, p. 14).  He complained of a knot on his head and
some raised skin or welts in the area where he had been firmly gripped on his arm.
(Dkt. 20, Ex. D, p. 23).  All of his physical injuries resolved promptly with no
residuals.  (Dkt. 20, Ex. D, p. 23).  This is consistent with the medical records
regarding his treatment that night.  (Dkt. 20, Ex. N, POH records regarding
Kourdon Maxwell, pp. 5-10).

Kartier Bomar was 12 years of age when she was deposed and was 10 years

of age at the time of the event.  She testified that she observed her brother come

into the kitchen scared and observed parts of the struggle, leaving at times to tend

to her younger brother who was then three years old.  (Dkt. 20, Ex. O, Kartier

Bomar deposition, p. 7).  She testified that, at times she and her little three year old

brother were staying in the bathroom, not out of fear so much as so that he could

use it.  (Dkt. 20, Ex. O, p. 9).  She also testified that they went upstairs to various

bedrooms.  According to defendants, it was not clear when she testified to looking

out of one bedroom window how she could do so, given that she placed herself in a

different bedroom at the same time.  (Dkt. 20, Ex. O, pp. 9-10).  Contrary to her

mother's testimony, Kartier testified that her mother was lying on her back with

face to the sky when the blow to the jaw was landed.  (Dkt. 20, Ex. O, p. 11)

Officer Main testified that he initially thought Ms. Bomar was striking

Kourdon and not himself.  From his own vantage point, Main had pursued an

individual who had intruded Ms. Bomar's home.  (Dkt. 20, Ex. B, p. 28).  Main's

clothing was marked "Police," which defendants suggest substantiates his initial

perception.  (Dkt. 20, Ex. B, pp. 18-19).  Kartier Bomar testified, however, that the

officers had on white t-shirts and army pants but nothing on their uniforms which

would describe them as being police officers.  (Dkt. 29, Ex. C, K. Bomar dep., p.

15).  Kartier testified that this prompted Germaine Bomar to have her daughter call

911 for because of the uncertainty of the identity of the intruders coming in the

back door.  (Dkt. 29, Ex. C, Kartier Bomar dep., p. 15; Ex. C, record of 911 call.

Main quickly became aware that Ms. Bomar was not striking the young man, but was instead striking him.  (Dkt. 20, Ex. B, pp. 28-29).  He then shifted his physical efforts from Kourdon to Ms. Bomar.  He passed Kourdon to the officer who was behind him, and attempted to secure Ms. Bomar, who continued to strike him.  (Dkt. 20, Ex. B, pp. 28, 30-32).  Once they were taken to the ground and handcuffed and the situation otherwise secured, Main concluded that the young man was not the individual they had been pursuing.  (Dkt. 20, Ex. B, p. 33).

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the evidence and all reasonable inferences must be construed in favor of the nonmoving party.  *Tanner v. County of Lenawee*, 452 F.3d 472, 477 (6th Cir. 2006).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Report and Recommendation
Motions for Summary Judgment
*Bomar v. City of Pontiac*; Case No. 08-12629

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-226 (6th Cir. 1994). Thus, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine

issue of material fact." *Id*., quoting, *Sperle v. Michigan Dept. of Corrections*, 297

F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted). "In deciding

a motion for summary judgment, [the] court views the factual evidence and draws

all reasonable inferences in favor of the nonmoving party." *McLean v. 988011*

*Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

    B.    Section 1983 Claims[1]

        1.    Defendants' position

As applied in the Sixth Circuit, a three step test has been developed,

systematically breaking down the second prong of the Saucier test into distinct

elements. To establish an exception to the broad qualified immunity, a plaintiff

must: (1) establish a violation of a particularized Constitutional right; (2) show that

the particularized Constitutional right was so clearly established at the time of the

event that any reasonable officer would know that the behavior violated that right;

and (3) present facts and evidence sufficient to show that the officer was

objectively unreasonable in light of the clearly established particularized right.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Defendants argue that the third

element pays heed to the Supreme Court cases preserving immunity for officers

merely in the face of reasonable mistakes. Defendants also point out that failing to

---

[1] Plaintiffs agree to dismiss their *Monell* based § 1983 claims, which means the City of Pontiac should be dismissed as well as all claims against any defendants in their official capacity.

satisfy any one of the three steps is fatal to a plaintiff's claim.

Defendants rely on *Smoak v. Hall*, 460 F.3d 769 (6th Cir. 2006) for the proposition that the third element is essentially a "bright line" test. In *Smoak,* there was a detention of a family traveling in their motor vehicle, which turned into an unlawful arrest in violation of the Fourth Amendment. And, even though there had been no underlying crime and thus no probable cause to make an arrest, because the officers had relied on specific information dispatched to them indicating that the *Smoak* family's vehicle had been involved in an armed robbery and was fleeing the scene, they were entitled to qualified immunity. A felony stop was initiated which turned into a full arrest. Ultimately, it was discovered that the entire matter was triggered by erroneous assumptions made by citizens who called 911. The detention and arrest had amounted to an actual violation of the Fourth Amendment. Nonetheless, the Court concluded that the officers were entitled to qualified immunity.

Defendants assert that it is this standard that plaintiffs must, and cannot, meet in order for defendants' motion to be defeated. Specifically, defendants argue that, based on the extensively developed factual record, it is clear that the individual officers did not know Kourdon Maxwell and were not singling him out as an individual person for persecution. Rather, a single black male was observed driving away in great haste on realization that police were at the scene. Based on

the cell phone communications, it was suspected that vehicle contained firearms, including semi-automatic rifles, and drugs. The officers engaged in pursuit by way of a cutoff at the pass tactic. Seeing no vehicle, they then slowly went up the street and observed a similar vehicle. Officer Wood testified that the vehicle seen driving away was a Taurus and that the vehicle he observed in the driveway was the same make and model. (Dkt. 20, Ex. F, pp. 8, 18-19). As Kourdon's testimony verifies, his head popped up from behind the vehicle, consistent with officer Main's testimony that it appeared to be a person crouching behind a car who popped up to see what was going on. According to defendants, the only way the officers can be faulted for doing anything wrong in pursuing the individual is to improperly utilize information available after fact, that is, only with 20/20 hindsight. Officer Main's testimony makes it clear that he believed the young man had engaged in home invasion. It was not Main's perception that the young man was going into his own home for the protection of his mother. Rather, it was his perception that he had run into a stranger's house to elude capture. (Dkt. 20, Ex. B, pp. 25-26, 28).

Similarly, the effort to restrain Ms. Bomar was in response to her attacking a police officer. With 20/20 hindsight, it can be understood why she did what she did. However, defendants assert that is not the standard given that she is not defending criminal charges of assaulting an officer or resisting and obstructing an

officer.  Rather, the appropriate inquiry is whether, from the officer's perspective, she was attacking him and thus, he was justified in defending himself and detaining her.  Defendants argue that, based on what the officers knew at the time and judging it from their perspective, without the benefit of 20/20 hindsight, plaintiffs have not come forward with facts contained within this record and law that would illustrate that the officers had engaged in conduct beyond that which the law would tolerate.

To the extent the cause of action against defendants is premised on the notion that Kourdon should not have been pursued, that Kourdon should not have been seized or detained and/or that Ms. Bomar should not have been seized or detained, defendants argue that such claims should be dismissed via summary judgment based on qualified immunity because even if the officers were ultimately wrong about their perception of the facts, if their perception of the facts is reasonable under the circumstances, defendants argue that they are entitled to qualified immunity.  *Saucier*, at 533 U.S. 205.  They further assert that, in order to deny that aspect of this motion, this Court would have to conclude that any reasonable officer would have known that the pursuit, seizure and detention of Kourdon and Ms. Bomar was "clearly beyond the pale."  Even in *Saucier*, defendants argue, the force in controversy was deemed gratuitous, *i.e.*, unnecessary; however, under the totality of the circumstances, the Supreme Court

still concluded that the officers were entitled to qualified immunity. Similarly, defendants assert that Ms. Bomar was quite hysterical and even if she were handcuffed, such would not prevent her from attempting to stand up and attack the officers by way of kicking, head butting or charging them with her shoulder. According to defendants, there are any number of things a handcuffed person can do and there is no rule that once a person is handcuffed they are automatically deemed subdued and not properly the subject of appropriate force. Defendants argue that the record is replete with observations that the scene was quite chaotic until the officers had it under control. Ms. Bomar was yelling and screaming at these men who had attacked both her son and herself. While her upset is quite understandable, defendants assert that, from the vantage point of the officers, they were confronted with a volatile situation and needed to get it under control. Until the situation had been secured, for all they knew both the young man and the woman were connected to serious drug trafficking involving AK-47's and the like.

Defendants argue that, it is only with 20/20 hindsight that one can argue that a post-handcuff blow and pepper spray, no matter how inconsistent with other contemporaneous records, amounted to that which was beyond what the law would tolerate. At the time of the alleged blow, the situation had not yet been secured and it was not yet clear what the relationship was between Kourdon and Ms. Bomar, and even if Kourdon lived in that house. All the officers were aware of was that

they were in pursuit of a young black male suspected of having driven the vehicle believed to be containing drugs and semiautomatic weapons. The officers observed Kourdon disobey their instructions to stop and flee. For all they knew, at the time they were attempting to subdue him, he had invaded the home of a private citizen. Defendants argue that a blow to the head with a flashlight, baton or even a fist in connection with someone who is resisting an arrest with an immediate history evidencing a willingness to flee the scene does not demonstrate a departure into what is clearly and objectively unreasonable force under a qualified immunity analysis.

      2.     Plaintiffs' position

Plaintiffs' asserts that the facts in *Smoak* are distinguishable from the facts presented in the matter before the Court. In *Smoak*, the officers were found to have violated the Fourth Amendment rights of the plaintiffs but the Court found that the officers were entitled to qualified immunity on the plaintiffs' false arrest claim essentially because the officers were relying on false or negligent statements made by a citizen who called 911 thinking a robbery had taken place and that the plaintiffs were involved. Furthermore, before the arrest the officers found identification that linked the plaintiffs in that case to the specific car that the officers had been informed was involved in the robbery. In other words, the Court found that the officers involved in *Smoak* did not act unreasonably based on the

information that was presented to them. According to plaintiffs, the same thing cannot be said in this case. Contrary to the facts as set forth in *Smoak*, plaintiffs argue that defendants here were not relying on information that was merely faulty and erroneous; they were guessing that the car in plaintiffs' driveway was the car that they had seen prior at the home where the drug raid was being conducted. Moreover, they were not relying on faulty information given to them by a third party; rather, according to plaintiffs, they were acting on a hunch (Dkt. 29, Ex. F, Wood dep., pp 18-19).

Plaintiff also asserts that, in this case, exigent circumstances did not exist. Based on the facts as presented, defendants were only aware that a car came to the scene of a drug raid, then quickly backed away and vanished from their view. Based on defendants' own statement of facts, the record does not verify whether or not the officers had any idea if this vehicle that left the scene contained weapons or other contraband, which was mere conjecture on officers' part based on certain cell phone conversations they had with unknown individuals. According to plaintiff, any "hot pursuit" would have ended when they lost sight of the vehicle and were merely combing the neighborhood looking for a similar vehicle. Officer Wood testified in his deposition that the car found in plaintiffs' driveway looked similar to the car that had backed away from the scene of the drug raid but agreed with plaintiffs' counsel that this was only speculation. Furthermore, there is no

testimony developed through the discovery that Kourdon represented an "immediate threat" to the arresting officers or the immediate public. According to plaintiffs, the circumstances did not suggest that immediate police action was necessary to prevent the destruction of evidence or to stop the escape of known criminals due to the fact that defendant officers were essentially acting on speculation that Kourdon was the individual who left the scene from the drug raid house. Although Main suggests in his testimony that when Kourdon entered the back door of his house, Main thought that a possible home invasion was occurring (thus creating the exigent circumstance), plaintiffs argue that this is not supported by his own testimony. According to plaintiffs, Main admitted that he was already in plaintiffs' home by several steps struggling with Kourdon before he was confronted by Ms. Bomar who had told him to "get out of her house." An individual who is the victim of a home invasion would not be telling a police officer to "get out of her house." Thus, plaintiffs argue that entry into their home without a warrant, without consent, and without exigent circumstances established a violation of the Fourth Amendment, a right which has long been established and of which any reasonable officer would have been aware.

As to the excessive force claims, Kourdon testified that while he was in the house and before he was taken outside of the house and handcuffed on the ground, he was struck by one of the officers with a flashlight that knocked him to the

ground.  Plaintiff asserts that there is no apparent justification in the record for the use of such force against a child of this age.  And, his injuries are documented by hospital records reflecting treatment that evening, the records of which show that he reported being struck with a flashlight, suffering a blow to his left forehead, and being down on the ground while he was walking his dog in the backyard.  (Dkt. 29, Ex. G).

Ms. Bomar testified that she was struck by Main, while being pulled out of the house and after she had been subdued, laying face down on the ground while being handcuffed behind her back and that she was pepper-sprayed by Main. According to plaintiff, punching an individual in the face or jaw after they have been subdued and handcuffed and when they represent no flight risk is a classic example of unnecessary and excessive force.  Plaintiffs also argue that it is well-established that the use of pepper spray on a detained person has been secured and is not acting violently or representing a threat to officers, is excessive force. *Cabaniss v. City of Riverside*, 251 Fed.Appx. 407, 413 (6th Cir. 2007).

### 3. Conclusions

"[C]laims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In determining whether a constitutional violation based on excessive force has occurred, the Sixth Circuit applies "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007), citing, *Graham*, 490 U.S. at 395-96. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236, quoting, *Graham*, 490 U.S. at 396.

Bearing in mind that the Courts have a very limited ability to make

credibility determinations[2] on a motion for summary judgment and must generally not make any credibility determinations on a motion for summary judgment and must take the evidence in light most favorable to the plaintiff, the undersigned suggests that there are material questions of fact as to whether officer Main used excessive force on Ms. Bomar after she was handcuffed by punching her and using pepper spray. Ms. Bomar testified that Main pepper sprayed her and struck her one time on the jaw after she was handcuffed. (Dkt. Ex. G, pp. 52-53). Officer Main testified that it was not difficult to get the handcuffs on plaintiff, that she "fought a little bit but it wasn't hard to get them on her." (Dkt. 20, Ex. B, p. 30). Officer Main recalls getting Ms. Bomar outside and on the ground and that she was "vocalizing" a "probably a little bit higher" than conversational tone. (Dkt. 20, Ex. B., p. 32). Under long-standing case law in this circuit, "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d 356 (6th Cir. 2009), citing, *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ("The general consensus

---

[2] In *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007), the Supreme Court viewed a videotape of the incident in question and concluded that it would be impossible for a jury to find in plaintiff's favor. Here, there is no such undisputed or indisputable evidence and the Court is prohibited from making any credibility judgment or weighing of the evidence. *Schreiber*, at *8, citing, *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

among our cases is that officers cannot use force ... on a detainee who has been subdued" and "is not resisting arrest."); *Bultema v. Benzie County*, 146 Fed.Appx. 28, 35, 37 (6th Cir. 2005) ("when a suspect has already been restrained, the officer's constitutional authority to use force is significantly more circumscribed" and the "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (holding that "no reasonable officer would have continued to spray a chemical agent in the face of a handcuffed and hobbled ... arrestee"); *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002) (holding that no reasonable officer would strike a handcuffed arrestee in the head); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) ("A reasonable person would know that spraying mace on an ... incapacitated person ... would violate the right to be free from excessive force"); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (holding that a "totally gratuitous blow with a policeman's nightstick" to a handcuffed, unresisting suspect was constitutionally unreasonable); *Lewis v. Downs*, 774 F.2d 711, 714 (6th Cir. 1985) (holding that beating and kicking restrained suspects who are in the control of the police is "plainly excessive" force).

While Ms. Bomar testified that Main punched her and pepper sprayed her after she was handcuffed and on the ground outside of her home, it is not entirely

clear from the record whether Ms. Bomar was otherwise restrained and subdued after being hand-cuffed.  While Ms. Bomar does not expressly testify that she was no longer resisting in any fashion after being cuffed and placed on the ground, the officers did not testify that she was not fully restrained at this point.  Rather, counsel for defendants merely argues that a handcuffed person is not always necessarily restrained and subdued.  The heart of the fact question presented in this case is not simply whether, after handcuffing her and placing her on the ground outside of her home, officer Main punched Ms. Bomar in the face and used pepper spray, but whether was Ms. Bomar was sufficiently subdued and restrained when these events occurred.  The undersigned suggests that, based on this record, Defendants' attempt to paint Ms. Bomar's injuries as specious merely illustrates the factual disputes presented here.  The undersigned suggests that these are fact questions for the jury to decide.  *See e.g.*, *Atkins v. Township of Flint*, 94 Fed.Appx. 342 (6th Cir. 2004), citing, *Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999) (reversing the district court's grant of summary judgment on defendant police officer's qualified immunity defense where the plaintiff's version of the material events differed from the defendant's version and where the plaintiff's version, if accepted, supported a claim for excessive force).  Admittedly the conduct of officers is to be viewed with a degree of deference because they "'have to make split-second judgments - in circumstances that are tense, uncertain, and

rapidly evolving'" but a court must be able to determine the conduct in question is objectively reasonable before summary judgment can be granted. *Id*. at 353. Based on the foregoing authority, the undersigned suggests that a fact question on the narrow issue of officer Main's conduct (after Ms. Bomar was handcuffed) exists and his motion for summary judgment should be denied in this respect.

As to plaintiffs' other constitutional claims, the undersigned suggests that plaintiffs' claims are barred by the doctrine of qualified immunity and that defendants' motion for summary judgment should be granted. The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing defendants are not entitled to qualified immunity. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

The Supreme Court had established a two-part test in order to determine whether a qualified immunity was applicable to a particular situation. *Saucier v. Katz*, 533 U.S. 194 (2001). The first part of the test involved a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff,

"show the officer's conduct violated a constitutional right." *Id*. at 201. If the first question was resolved in the affirmative then the court would decide "whether the right was clearly established." *Id*. If both questions are resolved in the affirmative, then the doctrine of qualified immunity does not apply and the case can proceed. The Supreme Court has revisited their decision in *Saucier* and concluded that the mandatory order of the two-part test for determining if qualified immunity applied was no longer sound based on several factors including judicial economy. *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808 (2009). While not modifying the factors that should be considered in such a decision, the Court held that sometimes it makes sense to allow the second part of the test to be decided first and that such a decision may resolve the controversy without having to address the first part of the test. In *Pearson*, the § 1983 claim of the plaintiff was based on an allegedly unlawful search conducted by the defendant police officers. Without having to engage in the perhaps more complicated decision of determining whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established where lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

According to the Sixth Circuit, if the Court finds that the first two

requirements of *Saucier* have been satisfied, the final inquiry is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Sample v. Bailey*, 409 F.3d 689, 696 n. 3 (6th Cir. 2005), quoting, *Feathers*, 319 F.3d at 848. The Sixth Circuit relies on the Supreme Court's holding that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Sample*, 409 F.3d at 696 n. 3, quoting, *Saucier*, 533 U.S. at 205. "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of legal rules that were 'clearly established' at the time it was taken." *Sample*, 409 F.3d at 696 n. 3, quoting, *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted). Thus, the Supreme Court explained that "even if a court were to hold that [an] officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Sample*, 409 F.3d at 696 n. 3, quoting, *Saucier*, 533 U.S. at 206. However, as recently noted by this Court, the Sixth Circuit has consistently held that "[w]here the reasonableness of an officer's actions hinge on disputed issues of fact, the jury becomes the final arbiter of ...

immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Mitchell v. County of Washtenaw*, 2009 WL 909581, *4 (E.D. Mich. 2009), quoting, *Leonard v. Robinson*, 477 F.3d 347, 354, 355 (6th Cir. 2007) (internal quotation marks and citation omitted). "Where ... the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability, and thus summary judgment should not be granted." *Mitchell*, at *4, quoting, *Griffith v. Coburn*, 473 F.3d 650, 656-657 (6th Cir. 2007) (internal quotation marks and citation omitted).

Officers have a right to stop a person and make an inquiry if they have a reasonable suspicion that criminal conduct has or will take place. *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). As part of that right to make such an inquiry, the officers have the right to detain the suspect for the purpose of making a reasonable inquiry relating to the suspicious conduct. *Id.* In the present circumstances, the officers had a reasonable suspicion that Kourdon was involved in (the drug transaction) or about to be involved in criminal conduct (a home invasion) and therefore had a right to pursue and to detain him while the inquiry was being made. The undersigned suggests that defendants actions fall within the "exigent circumstances" exception to the Fourth Amendment, which excuses the warrant requirement for entry into a home where (1) the officers involved were in

hot pursuit of a fleeing suspect; (2) the suspect posed an immediate threat to arresting officers or to the public; and (3) immediate police action was necessary to prevent the destruction of vital evidence or to prevent the escape of a known criminal. *Ingram v. City of Columbus*, 185 F.3d 579, 587 (6th Cir. 1999), citing, *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir.1989). While plaintiffs assert that once defendants lost sight of the suspect, they could no longer be in "hot pursuit," the undersigned suggests that there is no support in the law for this proposition. Plaintiff does not offer any evidence of a significant lag time between when the officers were in visual contact with the vehicle that drove away and when they spotted the similar vehicle in the Bomar driveway. The record, although not entirely clear on this point,[3] suggests that the officers' were in continuous pursuit and that only minutes had passed from seeing the suspect flee in his vehicle and spotting a similar vehicle in the Bomar driveway.

Further, under the circumstances presented (similar automobile spotted in the driveway, a person matching the suspect's general description was spotted, the person fled from the police), the undersigned suggests that the officers' actions were objectively reasonable. Plaintiff asserts that the cellular phone calls identified

---

[3] The last time notation in the police report was at 2120 on the date of the incident, which is the time that the officers seized the first suspect, and before receiving the cellular phone calls alerting them to the second vehicle. (Dkt. 20, Ex. A, p. 3).

in the police reports did not have sufficient indicia of reliability to support

defendants' claim of exigent circumstances. It is true that some telephone tips or

911 calls do not have sufficient indicia of reliability to support a finding of

exigency. *Schreiber v. Moe*, — F.3d —, 2010 724021 (6th Cir. 2010), citing,

*Kerman v. City of New York*, 261 F.3d 229, 235-36 (2d Cir. 2001) (concluding that

an anonymous 911 call, by itself, provides an insufficient basis for a finding of

exigency). These circumstances are similar to those in *Schreiber v. Moe*, where the

police officer, acting on an anonymous 911 call, heard shouting outside the

plaintiff's home, and after knocking on the door of the home and being informed

that the police were concerned about the plaintiff's daughter's welfare, the plaintiff

told the officer to leave, using a slew of profanity. The officer's entry into the

home to ensure that the plaintiff's daughter was unharmed was objectively

reasonable under the circumstances. *Schreiber*, at *5-6. The undersigned suggests

that the actions of defendants in this case were not based solely on the phone tips,

but rather, were also based on the reasonable suspicion that Kourdon was involved

in the drug transaction or about to be involved in criminal conduct (a home

invasion), a finding a similar vehicle in the driveway, and seeing a person

matching the suspect's general description who fled from the police. Similarly,

defendants had a right to detain Ms. Bomar, given her undisputed assault and

battery on a police officer. *See Atchley*, *supra*.

Here, the undersigned suggests that these claims do not turn on which version of the facts one accepts. Rather, in this case, as to plaintiffs' claims of warrantless entry, false arrest/imprisonment,[4] and excessive force up to and including the point of being handcuffed, the undersigned suggests that, based on the undisputed facts, defendants' actions were objectively reasonable. Therefore, the undersigned suggests that defendants' motion for summary judgment be granted as to the remainder of plaintiffs' constitutional claims.

C.    State Law Claims

1.    Battery and False Imprisonment

False imprisonment has been defined under Michigan law as an unlawful restraint on a person's liberty or freedom of movement. *Clarke v. Kmart Corp.*, 197 Mich.App. 541, 546, 495 N.W.2d 820 (1992). As observed by the Sixth Circuit, under Michigan law, an individual may bring a battery claim against officers who "use[ ] more force than reasonably necessary in effecting an arrest," *White v. City of*

---

[4] False arrest is one form of false imprisonment and does not state a distinct cause of action from false imprisonment. *Wallace v. Kato*, 549 U.S. 384, 388-89 (2007). To succeed on a claim of false imprisonment, under § 1983 or Michigan law, requires plaintiffs to show that there was no probable cause for the arrest. *Peterson Novelties, Inc. v. Berkley*, 259 Mich.App. 1, 18 (2003) (To sustain a claim of false imprisonment, the confinement must "have occurred without probable cause to support it."); *Stemler v. City of Florence*, 126 F.3d 856, 871-72 (6th Cir. 1997) (finding the existence of probable cause for arrest forecloses false arrest claims). However, the issue presented by defendants' motion for summary judgment is whether defendants, regardless of the existence of probable cause, are entitled to qualified immunity.

*Vassar*, 157 Mich.App. 282, 403 N.W.2d 124, 130 (1987) (per curiam), and

"actions which would normally constitute intentional torts are protected by

governmental immunity" only if "those actions are justified," *Brewer v. Perrin*, 132

Mich.App. 520, 349 N.W.2d 198, 202 (1984). *Lawler v. City of Taylor*. 268

Fed.Appx. 384, 388 (6th Cir. 2008). In this Circuit, courts generally hold that an

assault and battery claim asserted under Michigan law rises or falls with an

excessive force claim. Specifically, where the amount of force is found to be

constitutionally reasonable, a state law assault and battery claim will also fail.

*Schliewe v. Toro*, 138 Fed.Appx. 715, 722 (6th Cir. 2005), citing, *Anderson v.*

*Antal*, 1999 WL 717993, *6 (6th Cir. 1999); *Hall v. Township of Mount Morris*,

198 F.Supp.2d 906, 920 (E.D. Mich. 2002); *see also Lawler*, 268 Fed.Appx. at 388

("Because a triable issue of fact exists over whether [the officer] used objectively

unreasonable force, the district court correctly denied [the officer's] summary

judgment motion on these claims as well."). And, where a detention is reasonable

under federal law, a state law claim of false imprisonment will also fail. *Battiste v.*

*Rojeski*, 257 F.Supp.2d 957 (E.D. Mich. 2003). Based on the foregoing, the

undersigned suggests that only Ms. Bomar's claim for battery against officer Main

survives summary judgment, given the undersigned conclusions regarding

plaintiffs' federal claims.

2.     Intentional Infliction of Emotional Distress

Under Michigan law, a plaintiff must demonstrate that the officers' conduct was extreme and outrageous in order to sustain a claim of intentional infliction of emotional distress. *Schliewe*, 138 Fed.Appx. at 723, citing, *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985); *VanVorous v. Burmeister*, 262 Mich.App. 467, 687 N.W.2d 132 (2004). A plaintiff must meet a very high burden to show extreme or outrageous conduct, and the fact that a plaintiff cannot meet the lower standard of deliberate indifference precludes a finding that a genuine issue of material fact has been raised on whether the officers conduct was "beyond all possible bounds of decency." *Id.*, citing, *VanVorous*, 687 N.W.2d at 142.

Similarly, the undersigned suggests that, where the officers' conduct has been deemed objectively reasonable, no intentional infliction of emotional distress can be sustained. As applied, the *prima facie* claim of intentional infliction of emotional distress involves the following four elements: (1) the defendant's extreme and outrageous conduct; (2) the defendant's intent or recklessness; (3) causation; and (4) severe emotional distress actually suffered by the plaintiff. *Lavack v. Owens World Wide Enterprise Network, Inc.*, 409 F.Supp.2d 848, 857 (E.D. Mich. 2005). Under Michigan law, the question of whether the conduct in this case is sufficiently extreme and outrageous to justify the cause of action to proceed is a question of law for the Court. *Van Vorous*, 262 Mich.App. at 481. A trial court is to serve as the gatekeeper as to whether the conduct in question could reasonably be deemed

sufficiently extreme and outrageous before even allowing it to go to the jury.

*Sawabini v. Desenberg*, 143 Mich.App. 373, 383; 372 N.W.2d 559 (1985). Given

the foregoing conclusions that Ms. Bomar has raised a material question of fact

regarding whether officer Main used excessive force (after she was handcuffed), the

undersigned suggests that, likewise, there remains a question of fact as to whether

the alleged excessive force was extreme and outrageous. *See e.g.*, *Wells v. City of*

*Dayton*, 495 F.Supp.2d 797, 815 (S.D. Ohio 2006).

Defendants correctly point out that the officers took no action with respect to

plaintiff Kartier Bomar. Thus, she cannot sustain a claim for intentional infliction

of emotional distress. Defendants also correctly point out that Kartier does not

assert, in the third amended complaint, a claim for negligent infliction of emotional

distress. A claim of negligent infliction of emotional distress must include the

following elements:

> (1) serious injury threatened or inflicted on a person, not
> the plaintiff, of a nature to cause severe mental
> disturbance to the plaintiff, (2) shock by the plaintiff from
> witnessing the event that results in the plaintiff's actual
> physical harm, (3) close relationship between the plaintiff
> and the injured person (parent, child, husband, or wife),
> and (4) presence of the plaintiff at the location of the
> accident at the time the accident occurred or, if not
> present, at least shock 'fairly contemporaneous' with the
> accident.

*Aureus Holdings, Ltd. v. City of Detroit*, 2006 WL 1547639 (E.D. Mich. 2006),

citing, *Hesse v. Ashland Oil, Inc.,* 466 Mich. 21, 34, 642 N.W.2d 330 (2002). No such claim is made in plaintiffs' complaint, despite three opportunities for amendment. Thus, Kartier's claim must fail as a matter of law.

## IV.   RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** in part. The only claims that remain are Germaine Bomar's claims that (1) her constitutional right to be free from excessive force was violated by defendant Main after she was handcuffed and that (2) defendant Main committed a state law battery on her after she was handcuffed. All other claims and defendants should be **DISMISSED** with prejudice.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*,

829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 8, 2010
        s/Michael Hluchaniuk
        Michael Hluchaniuk
        United States Magistrate Judge

# <u>CERTIFICATE OF SERVICE</u>

I certify that on March 8, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Paul M. Hughes and Eric S. Goldstein</u>.

<div style="margin-left: 50%;">

<u>s/Tammy Hallwood          </u>
Case Manager
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7887
tammy_hallwood@mied.uscourts.gov

</div>